FILED

2012 FEB 24 · A 11: 49

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
N.D. CA.-SAN JOSE

160    8:

# 1

1  ROBBINS UMEDA LLP
   BRIAN J. ROBBINS (190264)
2  KEVIN A. SEELY (199982)
   JAY N. RAZZOUK (258511)
3  brobbins@robbinsumeda.com
   kseely@robbinsumeda.com
4  jrazzouk@robbinsumeda.com
   600 B Street, Suite 1900
5  San Diego, CA 92101
   Telephone: (619) 525-3990
6  Facsimile (619) 525-3991

7  Attorneys for Plaintiff

8  [Additional Counsel on Signature Page]

9             UNITED STATES DISTRICT COURT

10           NORTHERN DISTRICT OF CALIFORNIA

11                                          CV 12 - 00927 HRL

   ANTONIOS S. SOULIS, Derivatively on     )  Case No.
12 Behalf of NETFLIX, INC.,                 )
                                            )
13                         Plaintiff,       )  VERIFIED SHAREHOLDER DERIVATIVE
                                            )  COMPLAINT FOR BREACH OF
14          vs.                             )  FIDUCIARY DUTY, WASTE OF
                                            )  CORPORATE ASSETS, AND UNJUST
15 REED HASTINGS, NEIL D. HUNT,             )  ENRICHMENT
   THEORDORE A. SARANDOS, DAVID             )
16 HYMAN, DAVID B. WELLS, PATTY             )
   MCCORD, LESLIE J. KILGORE,               )
17 CHARLES H. GIANCARLO, JAY C.             )
   HOAG, TIMOTHY M. HALEY, RICHARD          )
18 N. BARTON, GEORGE BATTLE, and ANN        )
   MATHER,                                  )
19                                          )
                           Defendants,      )
20          and                             )
                                            )
21 NETFLIX, INC., a Delaware corporation,   )
                                            )
22                    Nominal Defendant.    )  DEMAND FOR JURY TRIAL
                                            )
23

24

25

26

27

28

―――――――――――――――――――――――――――――――――――――――――――

BY FAX

subscriptions for its customers, the Company's stock was trading at artificially inflated prices. Under the repurchase authorization, the Company spent as much as $283.06 per share (the Company's stock has not been above $150.00 in five months) and spent more than $200 million in total on repurchasing its own artificially inflated stock.

5.  While the Company's stock was artificially inflated and being purchased back by the Company, seven of eight Board members sold their personal shares while causing Netflix to make improper statements. In total, twelve of the Individual Defendants made illicit sales based on non-public information for over $89.5 million in ill-gotten gains.

6.  Finally, On September 15, 2011, Netflix issued a press release announcing an update to its third quarter 2011 guidance. Netflix revealed that it had lost a million subscribers upon its price increases becoming effective. On this news, Netflix stock collapsed nearly $40 per share to close at just under $170 per share on September 15, 2011, a one-day decline of nearly 19%. The stock value and market capitalization fell further when defendants were forced to announce on September 19, 2011 that, in an effort to offset skyrocketing costs and rapidly defecting customers, the Company would begin charging separately for its two services and had raised prices as much as 60%. The streaming service would retain the Netflix name, while the DVD service would be renamed Qwikster. Netflix stock market capitalization dropped over $5.4 billion, or 44%, in a matter of days on this news.

7.  Then, on October 24, 2011, Netflix issued its third quarter 2011 shareholder letter in which it reported a net loss of 810,000 U.S. subscribers, translating into a cumulative loss of 5.5 million subscribers. The subsequently filed Form 10-Q revealed that Netflix's obligations for content over the coming years had skyrocketed to $3.5 billion, with $2.8 billion due within three years.

8.  In the wake of the disclosure about the Company's true business prospects, Netflix's stock market capitalization plunged more than $11.6 billion, or 74%, to $4 billion, compared to the

- 2 -

## NATURE OF THE ACTION

1. This is a verified shareholder derivative action brought on behalf of nominal defendant Netflix, Inc. ("Netflix" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law. These wrongs resulted in billions of dollars in damages to Netflix's reputation, goodwill, and standing in the business community. Moreover, these actions have exposed the Company to billions of dollars in potential liability for violations of state and federal law.

2. Netflix is an internet subscription service that streams television shows and movies. The Company's subscribers can watch unlimited television shows and movies streamed over the Internet to their televisions, computers, and mobile devices. In the United States, subscribers can also receive DVDs delivered to their homes. The Company is organized into two operating segments: United States and International. The Company obtains content from various studios and other content providers through fixed-fee licenses, revenue sharing agreements, and direct purchases. Netflix's fastest growing and most important segment is its streaming business. This business depends upon Netflix having an adequate amount of content available for its customers. Rights to obtain this content are becoming increasingly expensive and the Individual Defendants (as defined herein) were aware of this fact.

3. Despite knowing this or being reckless in not knowing it, the Individual Defendants made improper statements about Netflix's ability to secure content and maintain profit margins. Moreover, rather than fully disclose the devastating cost increases which were then threatening Netflix's entire business, defendants talked about Netflix's ability to grow.

4. While the improper statements were being made, the Board of Directors ("Board") of Netflix authorized the repurchase of $300 million worth of Netflix's own shares and ended up purchasing over $200 million worth of artificially inflated shares under the repurchase program. As a result of the higher license fees that would be negotiated, lower profit margins, and increased

- 1 -

market capitalization high of $15.6 billion one June 30, 2011. Further, as a direct result of this unlawful course of conduct, the Company is now the subject of a federal securities class action lawsuit filed in the U.S. District Court for the Northern District of California on behalf of investors who purchased Netflix's shares.

## JURISDICTION AND VENUE

9.   Jurisdiction is conferred by 28 U.S.C. §1332. Complete diversity among the parties exists and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.   This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

11.   Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i) Netflix maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to Netflix, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## INTRADISTRICT ASSIGNMENT

12.   A substantial portion of the transactions and wrongdoings which give rise to the claims in this action occurred in the county of Santa Clara, and as such, this action is properly assigned to the San Jose division of this Court.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

# THE PARTIES

**Plaintiff**

13.     Plaintiff Antonios S. Soulis was a shareholder of Netflix at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Netflix shareholder.  Plaintiff is a citizen of Canada.

**Nominal Defendant**

14.     Nominal Defendant Netflix is a Delaware corporation and the world's leading internet subscription service for watching television shows and movies.  Netflix allows its subscribers to instantly watch unlimited television shows and movies streamed over the internet to their televisions, computers, and mobile devices. In the United States, subscribers can also receive standard definition DVDs, and their high definition successor, Blu-ray discs, delivered to their homes.  Netflix is located at 100 Winchester Circle, Los Gatos, California.  Netflix is named in this Complaint as a nominal defendant solely in a derivative capacity, and this shareholder derivative action is on its behalf.

**Defendants**

15.     Defendant Reed Hastings ("Hastings") is Netflix's Chief Executive Officer ("CEO") and has been since September 1998; President and has been since at least 2000; and Chairman of the Board and has been since he co-founded Netflix in 1997.  Hastings was also a member of Netflix's Stock Option Committee from at least April 2010 to at least April 2011.  Hastings is named as a defendant in securities class action complaints that allege he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Hastings knowingly, recklessly, or with gross negligence made improper statements in the Company's press releases and public filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain profit margins.  While in possession of material, non-public information concerning Netflix's true business health, Hastings

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  sold 190,000 shares of his stock for $43,252,600 in proceeds. Netflix paid Hastings the following

2  compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $519,231 | $4,996,988 | $414 | $5,516,633 |

Hastings is a citizen of California.

16.     Defendant Neil D. Hunt ("Hunt") is Netflix's Chief Product Officer and has been since 2002.  Hunt was also Netflix's Vice President of Internet Engineering from 1999 to 2002.  Hunt is named as a defendant in securities class action complaints that allege he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  While in possession of material, non-public information concerning Netflix's true business health, Hunt sold 35,589 shares of his stock for $8,311,798.17 in proceeds.  Netflix paid Hunt the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $864,103 | $1,118,333 | $7,620 | $1,990,056 |

Hunt is a citizen of California.

17.     Defendant Theodore A. Sarandos ("Sarandos") is Netflix's Chief Content Officer and Vice President of Content and has been since 2000.  Sarandos is also named as a defendant in securities class action complaints that allege he violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  While in possession of material, non-public information concerning Netflix's true business health, Sarandos sold 25,360 shares of his stock for $5,808,654.55 in proceeds.  Netflix paid Sarandos the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $900,000 | $1,460,040 | $14,120 | $2,374,160 |

Sarandos is a citizen of California.

18.     Defendant David Hyman ("Hyman") is Netflix's General Counsel and has been since 2002 and Secretary and has been since at least January 2008.  While in possession of material, non-

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  public information concerning Netflix's true business health, Hyman sold 9,520 shares of his stock

2  for $2,499,000 in proceeds.  Hyman is a citizen of California.

3       19.     Defendant David B. Wells ("Wells") is Netflix's Chief Financial Officer and has been

4  since December 2010.  Wells was also Vice President of Financial Planning and Analysis from

5  August 2008 to December 2010 and Director of Operations Planning and Analysis from March 2004

6  to August 2008.  Wells is named as a defendant in securities class action complaints that allege he

7  violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Wells knowingly,

8  recklessly, or with gross negligence made improper statements in the Company's press releases and

9  public filings that the Company would have to: (i) pay higher contract rates to its contract providers;

10  (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to

11  maintain profit margins.  While in possession of material, non-public information concerning

12  Netflix's true business health, Wells sold 6,196 shares of his stock for $1,549,100.76 in proceeds.

13  Netflix paid Wells the following compensation as an executive:

| Year | Salary | Option Awards | All Other Compensation | Total |
|------|--------|---------------|------------------------|-------|
| 2010 | $358,000 | $153,960 | $7,512 | $519,472 |

18  Wells is a citizen of California.

19       20.     Defendant Patty McCord ("McCord") is Netflix's Chief Talent Officer and has been

20  since 1998.  While in possession of material, non-public information concerning Netflix's true

21  business health, McCord sold 2,940 shares of her stock for $810,200 in proceeds.  McCord is a

22  citizen of California.

24       21.     Defendant Leslie J. Kilgore ("Kilgore") is a Netflix director and has been since

25  January 2012.  Kilgore was also Netflix's Chief Marketing Officer from March 2000 to February

26  2012.  Kilgore is named as a defendant in securities class action complaints that allege she violated

27  Sections 10(b) and 20(a) of the Securities Exchange Act of 1934.  Kilgore knowingly or recklessly

28  made improper statements in the Company's press releases and public filings that the Company

- 6 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its

2   content providers; and (iii) dramatically increase its prices to maintain profit margins.  While in

3   possession of material, non-public information concerning Netflix's true business health, Kilgore

4   sold 29,577 shares of her stock for $7,069,803.04 in proceeds.  Netflix paid Kilgore the following

5   compensation as an executive:

6

| Year | Salary | Option Awards | All Other Compensation | Total |
|---|---|---|---|---|
| 2010 | $774,038 | $2,007,040 | $7,620 | $2,788,698 |

7

8

9   Kilgore is a citizen of California.

10          22.     Defendant Charles H. Giancarlo ("Giancarlo") is a Netflix director and has been since

11   April 2007.  Giancarlo is also a member of Netflix's Audit Committee and has been since at least

12   April 2010.  Giancarlo knowingly or recklessly made improper statements in the Company's press

13   releases and public filings that the Company would have to: (i) pay higher contract rates to its

14   contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase

15   its prices to maintain profit margins.  As a member of the Audit Committee, Giancarlo reviewed and

16   approved similar improper statements.  While in possession of material, non-public information

17   concerning Netflix's true business health, Giancarlo sold 24,839 shares of his stock for

18   $5,830,429.37 in proceeds.  Netflix paid Giancarlo the following compensation as a director:

19

20

| Year | Option Awards | Total |
|---|---|---|
| 2010 | $311,572 | $311,572 |

21

22   Giancarlo is a citizen of California.

23          23.     Defendant Jay C. Hoag ("Hoag") is a Netflix director and has been since June 1999.

24   Hoag is also a member of Netflix's Compensation Committee and has been since at least April 2010.

25   Hoag knowingly or recklessly made improper statements in the Company's press releases and public

26   filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii)

27   pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain

28

- 7 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

profit margins.  While in possession of material, non-public information concerning Netflix's true business health, Hoag sold 24,122 shares of his stock for $5,555,067.66 in proceeds.  Netflix paid Hoag the following compensation as a director:

| Year | Option Awards | Total |
|------|---------------|-------|
| 2010 | $311,572 | $311,572 |

Hoag is a citizen of California.

24.    Defendant Timothy M. Haley ("Haley") is a Netflix director and has been since June 1998.  Haley is also Chairman of Netflix's Compensation Committee and a member of the Audit Committee and has been since at least April 2010.  Haley knowingly or recklessly made improper statements in the Company's press releases and public filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain profit margins.  As a member of the Audit Committee, Haley reviewed and approved similar improper statements.  While in possession of material, non-public information concerning Netflix's true business health, Haley sold 20,398 shares of his stock for $4,309,689.44 in proceeds.  Netflix paid Haley the following compensation as a director:

| Year | Option Awards | Total |
|------|---------------|-------|
| 2010 | $311,572 | $311,572 |

Haley is a citizen of California.

25.    Defendant Richard N. Barton ("Barton") is a Netflix director and has been since May 2002.  Barton knowingly or recklessly made improper statements in the Company's press releases and public filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain profit margins.  While in possession of material, non-public information

concerning Netflix's true business health, Barton sold 9,620 shares of his stock for $2,613,561.60 in proceeds. Netflix paid Barton the following compensation as a director:

| Year | Option Awards | Total |
|------|------|------|
| 2010 | $311,572 | $311,572 |

Barton is a citizen of Washington.

26.     Defendant A. George Battle ("Battle") is a Netflix director and has been since June 2005. Battle is also a member of Netflix's Compensation Committee and has been since at least April 2010. Battle knowingly or recklessly made improper statements in the Company's press releases and public filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain profit margins. While in possession of material, non-public information concerning Netflix's true business health, Battle sold 7,500 shares of his stock for $1,942,890 in proceeds. Netflix paid Battle the following compensation as a director:

| Year | Option Awards | Total |
|------|------|------|
| 2010 | $311,572 | $311,572 |

Battle is a citizen of California.

27.     Defendant Ann Mather ("Mather") is a Netflix director and has been since July 2010. Mather is also Chairman of Netflix's Audit Committee and has been since July 2010. Mather knowingly or recklessly made improper statements in the Company's press releases and public filings that the Company would have to: (i) pay higher contract rates to its contract providers; (ii) pay higher license fees to its content providers; and (iii) dramatically increase its prices to maintain profit margins. As a member of the Audit Committee, Mather reviewed and approved similar improper statements. Netflix paid Mather the following compensation as a director:

| Year | Fees Paid in Cash | Option Awards | Total |
|------|------|------|------|
| 2010 | $50,000 | $97,654 | $147,654 |

- 9 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   Mather is a citizen of California.

2       28.     The defendants identified in ¶¶15, 21-27 are referred to herein as the "Director

3   Defendants."   The defendants identified in ¶¶22, 24, 27 are referred to herein as the "Audit

4   Committee Defendants." The defendants identified in ¶¶15-26 are referred to herein as the "Insider

5   Selling Defendants."  Collectively, the defendants identified in ¶¶15-27 are referred to herein as the

6   "Individual Defendants."

7

8                    **DUTIES OF THE INDIVIDUAL DEFENDANTS**

9   **Fiduciary Duties**

10      29.     By reason of their positions as officers, directors, and/or fiduciaries of Netflix and

11  because of their ability to control the business and corporate affairs of Netflix, the Individual

12  Defendants owed and owe Netflix and its shareholders fiduciary obligations of trust, loyalty, good

13  faith, and due care, and were and are required to use their utmost ability to control and manage

14  Netflix in a fair, just, honest, and equitable manner.  The Individual Defendants were and are

15  required to act in furtherance of the best interests of Netflix and its shareholders so as to benefit all

16

17  shareholders equally and not in furtherance of their personal interest or benefit.

18      30.     Each officer and director of the Company owes to Netflix and its shareholders the

19  fiduciary duty to exercise good faith and diligence in the administration of the affairs of the

20  Company and in the use and preservation of its property and assets, and the highest obligations of

21  fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual

22  Defendants had a duty to promptly disseminate accurate and truthful information with regard to the

23  Company's operations, performance, management, projections, and forecasts so that the market price

24  of the Company's stock would be based on truthful and accurate information.

25

26  **Additional Duties of the Audit Committee Defendants**

27      31.     In addition to these duties, under the Company's Audit Committee Charter, the Audit

28  Committee Defendants Giancarlo, Haley, and Mather, owed specific duties to Netflix to review and

- 10 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

approve the Company's earnings press releases, guidance, and quarterly and annual financial statements.  The Audit Committee Charter provides in relevant part that the Audit Committee Defendants were required to monitor: "(i) the Company's financial reporting process, (ii) the Company's systems of internal controls over financial reporting, (iii) the integrity of the Company's financial statements, and (iv) the independent auditors' qualifications, independence and performance."  In particular, the Audit Committee Charter required that the Company's system of internal controls was to be "[r]eview[ed] on a continuing basis."

**Additional Duties under the Code of Ethics**

32.    In addition to these duties, under the Company's Code of Ethics (the "Code"), all employees, including the Board, owed specific duties to Netflix to provide full, fair, accurate, timely, and understandable disclosure.  In addition, the Code outlines the Individual Defendants' duties regarding honest and ethical conduct and conflicts of interest.  In particular, the Code states:

> Netflix Parties are expected to act and perform their duties ethically and honestly and with the utmost integrity. Honest conduct is considered to be conduct that is free from fraud or deception. Ethical conduct is considered to be conduct conforming to accepted professional standards of conduct. Ethical conduct includes the ethical handling of actual or apparent conflicts of interest between personal and professional relationships as discussed in below.

33.    Moreover, any violation of the "Code may result in disciplinary action, including termination, and if warranted, legal proceedings.  This Code is a statement of certain fundamental principles, policies and procedures that govern the Netflix Parties in the conduct of the Company's business."

**Control, Access, and Authority**

34.    The Individual Defendants, because of their positions of control and authority as officers and/or directors of Netflix, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

35.     Because of their advisory, executive, managerial, and directorial positions with Netflix, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and growth prospects of Netflix.  While in possession of this material, non-public information, the Individual Defendants made improper representations regarding the Company, including information regarding Netflix's business prospects, specifically regarding increased content fees and lower profit margins.

36.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of Netflix, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

37.     To discharge their duties, the officers and directors of Netflix were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of Netflix were required to, among other things:

(a)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial health;

(b)     refrain from acting upon material, inside corporate information to benefit themselves;

(c)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(d)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

- 12 -

1        (e)     remain informed as to how Netflix conducted its operations, and, upon receipt

2  of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

3  connection therewith, and take steps to correct such conditions or practices and make such

4  disclosures as necessary to comply with securities laws; and

5

6        (f)     ensure that the Company was operated in a diligent, honest, and prudent

7  manner in compliance with all applicable laws, rules, and regulations.

8  **Breaches of Duties**

9      38.    Each Individual Defendant, by virtue of his or her position as a director and/or

10  officer, owed to the Company and to its shareholders the fiduciary duty of loyalty and good faith and

11  the exercise of due care and diligence in the management and administration of the affairs of the

12  Company, as well as in the use and preservation of its property and assets.  The conduct of the

13  Individual Defendants complained of herein involves a knowing and culpable violation of their

14  obligations as officers and directors of Netflix, the absence of good faith on their part, and a reckless

15  disregard for their duties to the Company and its shareholders that the Individual Defendants were

16

17  aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the

18  Individual Defendants who were also officers and/or directors of the Company have been ratified by

19  the remaining Individual Defendants who collectively comprised all of Netflix's Board.

20      39.    The Individual Defendants breached their duty of loyalty and good faith by allowing

21

22  defendants to cause, or by themselves causing, the Company to make improper statements regarding

23  Netflix's business prospects, specifically regarding increased content fees and lower profit margins.

24  The Individual Defendants also failed to prevent the other Individual Defendants from taking such

25  illegal actions.  In addition, as a result of defendants' illegal actions and course of conduct, the

26  Company is now the subject of class action lawsuits that allege violations of securities laws.  As a

27  result, Netflix has expended, and will continue to expend, significant sums of money.

28

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

40.   In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

41.   During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) deceive the investing public, including shareholders of Netflix, regarding the Individual Defendants' management of Netflix's operations and its content fees; (ii) facilitate defendants Barton, Battle, Giancarlo, Haley, Hastings, Hoag, Hunt, Hyman, Kilgore, McCord, Sarandos, and Wells' illicit sale of over $89.5 million of their personally held shares while in possession of material, non-public information; and (iii) enhance the Individual Defendants' executive and directorial positions at Netflix and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

42.   The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

43.   The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

44.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

45.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## NETFLIX'S COMPENSATION POLICY

46.     As outlined in the Company's Proxy Statement, filed on April 20, 2011, individual compensation is linked to Company performance by virtue of the stock options granted by the Company.

47.     To that end, total compensation is expressed in a dollar-denominated amount, but may be allocated between the two primary elements of the Company's compensation program: salary and stock options.

48.     According to the April 20, 2011 Proxy Statement, after determining the total compensation amount for each named executive officer, which includes defendants Hastings, Hunt, Kilgore, Wells, and Sarandos, the total compensation amount for each individual is divided into the two key elements including both salary and stock options. This allocation is made pursuant to the compensation preferences of each named executive officer who, within the parameters of the total compensation, can request a customized combination of salary and stock options. It is fair to say that stock options are, and have been one of the favored, if not the key, compensation methods used by Netflix.

- 15 -

49.     Moreover, the Board has traditionally received the entirety of its director fees in the form of stock options, and the Board and management believe that stock options are important to recruiting and retaining high performing employees.

## FACTUAL ALLEGATIONS

50.     Netflix is a provider of on-demand internet streaming media in the United States, Canada, and Latin America and flat rate DVD-by-mail in the United States. The Company was established in 1997 and started its subscription-based digital distribution service in 1999.

51.     Netflix conducted an initial public offering on May 29, 2002, selling 5.5 million shares of common stock at the price of $15.00 per share. On June 14, 2002, the Company sold an additional 825,000 shares of common stock at the same price. After incurring substantial losses during its first few years, Netflix posted its first profit during fiscal year 2003, earning $6.5 million profit on revenues of $272 million.

52.     By 2009, Netflix was offering a collection of 100,000 titles on DVD and had surpassed 10 million subscribers. Netflix now also operates an online affiliate program which has helped it to build online sales for rentals. In addition, Netflix offers internet video streaming ("Watch Instantly") of selected titles to computers running Windows or Mac OS X and to compatible devices. Internet video streaming once came at no additional charge with Netflix's regular subscription service. However, only a small portion of Netflix's content is available via the Watch Instantly option. Initially, the feature offered subscribers one hour of media for approximately every dollar they spent on their subscription. In January 2008, however, Netflix lifted this restriction. Virtually all subscribers became entitled to unlimited hours of streaming media at no additional cost.

53.     On October 1, 2008, Netflix announced a partnership with Starz to bring over 2,500 new movies and television shows to Watch Instantly in what is called Starz Play. Since that time, Netflix has continued to grow its ability to stream movies and Starz Play has continued to be its most important provider of premium content for video streaming.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

54. However, even with expanded sources of content, the Individual Defendants were aware that the Company's rapid growth was in jeopardy. In 2011, the Company stopped providing as extensive of guidance as it had previously, limiting subscription and revenue projections to the following quarter rather than the full year. Netflix then announced an increase to the cost of services shortly after the second quarter ended, a move which predictably led to the defection of hundreds of thousands of subscribers. Finally, negotiations for the renewal of Netflix's contract with Starz broke down, as the Individual Defendants knew they would, given the price increase being sought by Starz.

55. This was noted in the Huffington Post on September 1, 2011, which stated in pertinent part: "Apparently, the money just isn't there, and it sounds like Starz is interested in seeing other people. Netflix paid $30 million back in October 2008 to gain the rights to stream Starz films, and many analysts called the deal a steal for Netflix."

56. This was, however, not a surprise to defendant Hastings given that in December 2010 he personally responded to an online blog post and stated in part:

> Moving on to the widely-discussed issue of increased content costs, it is true that we are paying more for any given piece of content than we were two years ago, and that in two years, we'll pay more than we pay today, Part of our goal as a business is to make money for content producers and to become one of their largest and best revenue sources. ***Fortunately, our subscriber base is growing fast enough, and DVD shipments are growing slow enough, that we can afford to pay for the existing streaming content we have, and also get more content.*** We try not to comment on specific deals, like the Starz renewal, as that rarely helps us get deals done.
>
> ***Investors sometimes see the content cost threat as an issue around our margins. But we have no intention of overspending relative to our margin structure, and there is no specific content that we "must have" at nearly any cost.*** In our domestic business we spend 65-70% of revenue on COGS (which is mostly content and postage). So if content costs rose faster than we expected, then in practice we'd have less content than otherwise, rather than less margin. This would ultimately show up in less subscriber growth than we wanted from a not-as-good-as-it-would-otherwise-be service; it would not likely show up as a sudden hit to margins. Management at Netflix largely controls margins, but not growth.
>
> Turning to competition, there is a legitimate short thesis in the unknown of who enters directly against us and when. Some offerings like Hulu Plus have

- 17 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

some content we do not, but we are making progress on the gap. In the near term, some of our subscribers will also subscribe to Hulu Plus, but very few will quit Netflix because we have lots of streaming content that Hulu Plus does not. For a competitive firm to materially hurt our growth, they have to have some positive differentiator (price, additional content, integration, etc.), and then they have to market their service effectively, This wild-card of major new competitor offering great content and marketing aggressively is the single best near-term short thesis, but no one knows if it will happen in 2011.

57.     On July 12, 2011, Netflix announced that it would separate the current subscription plans into two separate plans (effective September 1, 2011, for existing subscribers): one covering the instant streaming and the other covering DVD rental.  The cost for streaming would be $7.99 monthly while DVD rental would start at the same price.  The changes cut prices slightly for customers who only wanted to rent DVDs, but streaming video would now cost extra.  Customers who wanted both options would essentially have to pay for two separate rental packages, raising their overall bill.

58.     Netflix's customers had paid $9.99 a month for a plan that offered unlimited streaming plus one DVD at a time.  Under the new plan, an unlimited streaming-only plan would be $7.99 a month, while its "1 DVD at a time" plan would also cost $7.99.  Customers who want both streaming and DVDs will have to spend at least $15.98 a month instead of $9.99.

59.     The announcement led to a flurry of negative reaction amongst Netflix's Facebook followers, who proceeded to post negative comments on the Company's wall.  Twitter comments also spiked with a "Dear Netflix" trend that included generally negative comments as well.  The Company defended its decision during its initial announcement of the change.

60.     "Given the long life we think DVDs by mail will have, treating DVDs as a $2 add-on to our unlimited streaming plan neither makes great financial sense nor satisfies people who just want DVDs," Netflix wrote on its blog. "Creating an unlimited-DVDs-by-mail plan (no streaming) at our lowest price ever, $7.99, does make sense and will ensure a long life for our DVDs-by-mail offering."

- 18 -

61.     Regardless of Netflix's position on the issue, this announcement led to a steady fall in Netflix's market capitalization as subscribers faced with higher costs began to leave Netflix in favor of other lower cost DVD rental and video streaming providers.

62.     On September 18, 2011, defendant Hastings said in a Netflix blog post that the DVD section of Netflix would be split off and renamed Qwikster, and stated that the only major change would be separate websites for the services.  Netflix subscribers who wanted DVDs by mail would have to use a separate website to access Qwikster.  In an email to shareholders titled "An Explanation and Some Reflections," defendant Hastings stated that he "messed up" by implementing the split plan and higher fees.  In particular, defendant Hastings stated:

> I messed up.  I owe everyone an explanation.
>
> It is clear from the feedback over the past two months that many members felt we lacked respect and humility in the way we announced the separation of DVD and streaming, and the price changes.  That was certainly not our intent, and I offer my sincere apology.  I'll try to explain how this happened.

63.     Throughout 2010, Netflix's stock price increased 219% to $175.70.  At their peak, in July 2011, Netflix shares were trading for almost $299.  However, following the customer dissatisfaction and resulting loss of subscribers after the announcements by defendant Hastings that streaming and DVD rental would be charged separately, leading to a higher price for customers who wanted both, and that the DVD rental would be split off as the subsidiary Qwikster, the share price fell steeply, to around $130.  Over the following weeks, Netflix's value continued to slump, losing almost another 50%.

64.     On October 24, 2011, Netflix announced it lost 800,000 U.S. subscribers in the third quarter of 2011 with more subscriber losses expected in the fourth quarter of 2011.

65.     On September 1, 2011, just as Netflix's new scheme of pricing was going into effect, Starz, arguably Netflix's most important streaming content provider, announced it would remove

- 19 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

their movies from Netflix streaming services on February 28, 2012.  What this means for Netflix subscribers is that they will not have digital access to movies from Sony and Disney.

66.     The reality is buying premium content like Starz Play is much more expensive than it was when Netflix entered the original Starz' contract.  However, its importance was not lost on Netflix, who in its 2010 Annual Shareholder Report stated that "[i]f we are not successful in maintaining existing and creating new relationships, or if we encounter technological, content licensing or other impediments to our streaming content, our ability to grow our business could be adversely impacted."

67.     All of this makes Netflix's stock repurchases even more egregious.  Few fast-growing Silicon Valley companies buy back shares, preferring to hoard whatever cash they generate to fund expansion.  Not Netflix.  Since June 11, 2010, the Company has purchased over $209.3 million of its own artificially inflated stock.

68.     The Company paid an average of $238 per share in the second quarter of this year and $218 per share in the third quarter to purchase its own shares.  The stock has since plummeted to under $64 a share, before beginning to rebound because of a general upswing in the market.

69.     To help cover the cash gap caused by these buy backs, Netflix issued $200 million in bonds, on which it is paying 8.5% interest.  As a result, it finished June 30, 2011, with $176 million in net cash and short-term investments, down from $400 million at the end of 2006.

70.     All of these activities were undertaken in the face of escalating costs for the purchase of content for Netflix's streaming services, the likely loss of the ability to stream movies from Starz, the Company's top premium content provider, and an increase in subscription prices, all things the Board knew or were reckless in not knowing.

71.     Moreover, it was recently announced that Verizon is partnering with Coinstar to form a joint venture to sell video services aimed at competing against Netflix.  This move will provide even stiffer competition for Netflix when it comes to video streaming.  This is in addition to already

- 20 -

1 increased competition from the likes of Amazon and Hulu Plus, who are both new competitors in the

2 streaming video service market.

3       72.    What makes Netflix's stock repurchase program even more curious is that stock

4 repurchase programs are usually undertaken by mature companies where management feels that the

5 stock is underpriced, which is a situation in no way congruous with Netflix's circumstances. At the

6 time of Netflix's buybacks, the share price of Netflix was already trading at near historic highs.

7

8       73.    What did Netflix gain from the repurchases of its stock at such elevated prices?

9 When a company announces a buyback it is usually perceived by the market as a positive

10 occurrence, which often causes the share price to rise rapidly and increases the company's earnings

11 per share by reducing the number of shares in the market. This is what continued to happen to

12 Netflix's share price. The Insider Selling Defendants took advantage of this by selling their

13 artificially inflated shares for significant personal gains.

14

15       74.    As shown in the charts below, Hastings and the rest of the Individual Defendants

16 prospered from their ability to exercise stock options and then sell the shares at Netflix's inflated

17 stock price:

| Insider Last Name | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| BARTON | 7/27/2011 | 9,620 | $271.68 | $2,613,561.60 |
| | | 9,620 | | $2,613,561.60 |
| | | | | |
| BATTLE | 4/28/2011 | 1,000 | $233.29 | $233,290.00 |
| | 4/28/2011 | 1,000 | $234.90 | $234,900.00 |
| | 4/28/2011 | 500 | $236.40 | $118,200.00 |
| | 4/28/2011 | 500 | $238.00 | $119,000.00 |
| | 5/24/2011 | 1,500 | $250.00 | $375,000.00 |
| | 6/3/2011 | 1,500 | $275.00 | $412,500.00 |
| | 7/11/2011 | 1,500 | $300.00 | $450,000.00 |
| | | 7,500 | | $1,942,890.00 |
| | | | | |
| GIANCARLO | 1/19/2011 | 2,331 | $192.81 | $449,440.11 |
| | 1/19/2011 | 834 | $192.81 | $160,803.54 |
| | 2/1/2011 | 3,037 | $214.84 | $652,469.08 |
| | 3/1/2011 | 2,053 | $206.22 | $423,369.66 |
| | 3/1/2011 | 834 | $206.22 | $171,987.48 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 4/1/2011 | 1,883 | $241.00 | $453,803.00 |
| | 4/1/2011 | 834 | $241.00 | $200,994.00 |
| | 5/2/2011 | 1,855 | $238.22 | $441,898.10 |
| | 5/2/2011 | 833 | $238.22 | $198,437.26 |
| | 6/1/2011 | 1,815 | $269.23 | $488,652.45 |
| | 6/1/2011 | 833 | $269.23 | $224,268.59 |
| | 7/1/2011 | 1,805 | $262.06 | $473,018.30 |
| | 7/1/2011 | 833 | $262.06 | $218,295.98 |
| | 8/1/2011 | 1,712 | $268.52 | $459,706.24 |
| | 8/1/2011 | 833 | $268.52 | $223,677.16 |
| | 9/1/2011 | 1,681 | $234.53 | $394,244.93 |
| | 9/1/2011 | 833 | $234.53 | $195,363.49 |
| | | 24,839 | | $5,830,429.37 |
| HALEY | 1/28/2011 | 20,398 | $211.28 | $4,309,689.44 |
| | | 20,398 | | $4,309,689.44 |
| HASTINGS | 1/20/2011 | 5,000 | $186.72 | $933,600.00 |
| | 1/27/2011 | 5,000 | $207.11 | $1,035,550.00 |
| | 2/3/2011 | 5,000 | $211.05 | $1,055,250.00 |
| | 2/10/2011 | 5,000 | $220.97 | $1,104,850.00 |
| | 2/17/2011 | 5,000 | $235.87 | $1,179,350.00 |
| | 2/24/2011 | 5,000 | $212.50 | $1,062,500.00 |
| | 3/3/2011 | 5,000 | $206.43 | $1,032,150.00 |
| | 3/10/2011 | 5,000 | $191.08 | $955,400.00 |
| | 3/17/2011 | 5,000 | $216.94 | $1,084,700.00 |
| | 3/24/2011 | 5,000 | $231.98 | $1,159,900.00 |
| | 3/31/2011 | 5,000 | $237.28 | $1,186,400.00 |
| | 4/7/2011 | 5,000 | $235.38 | $1,176,900.00 |
| | 4/14/2011 | 5,000 | $237.72 | $1,188,600.00 |
| | 4/21/2011 | 1,500 | $244.12 | $366,180.00 |
| | 4/21/2011 | 3,500 | $244.12 | $854,420.00 |
| | 4/28/2011 | 5,000 | $233.00 | $1,165,000.00 |
| | 5/5/2011 | 5,000 | $226.43 | $1,132,150.00 |
| | 5/12/2011 | 5,000 | $241.21 | $1,206,050.00 |
| | 5/19/2011 | 5,000 | $243.00 | $1,215,000.00 |
| | 5/26/2011 | 5,000 | $258.75 | $1,293,750.00 |
| | 6/2/2011 | 5,000 | $266.03 | $1,330,150.00 |
| | 6/9/2011 | 5,000 | $262.22 | $1,311,100.00 |
| | 6/16/2011 | 5,000 | $256.45 | $1,282,250.00 |
| | 6/23/2011 | 5,000 | $245.00 | $1,225,000.00 |
| | 6/30/2011 | 5,000 | $264.61 | $1,323,050.00 |
| | 7/7/2011 | 5,000 | $293.20 | $1,466,000.00 |
| | 7/14/2011 | 5,000 | $299.50 | $1,497,500.00 |
| | 7/21/2011 | 5,000 | $281.80 | $1,409,000.00 |
| | 7/28/2011 | 5,000 | $264.54 | $1,322,700.00 |
| | 8/4/2011 | 5,000 | $257.05 | $1,285,250.00 |
| | 8/11/2011 | 5,000 | $235.11 | $1,175,550.00 |
| | 8/18/2011 | 5,000 | $224.13 | $1,120,650.00 |
| | 8/25/2011 | 5,000 | $217.79 | $1,088,950.00 |
| | 9/1/2011 | 5,000 | $234.53 | $1,172,650.00 |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

| | | | | |
|---|---|---|---|---|
| | 9/8/2011 | 5,000 | $214.06 | $1,070,300.00 |
| | 9/15/2011 | 5,000 | $177.00 | $885,000.00 |
| | 9/22/2011 | 5,000 | $132.13 | $660,650.00 |
| | 9/29/2011 | 5,000 | $128.13 | $640,650.00 |
| | 10/6/2011 | 5,000 | $119.70 | $598,500.00 |
| | | **190,000** | | **$43,252,600.00** |
| | | | | |
| **HOAG** | 2/2/2011 | 9,500 | $211.06 | $2,005,058.60 |
| | 5/5/2011 | 10,112 | $231.62 | $2,342,177.84 |
| | 7/28/2011 | 4,510 | $267.81 | $1,207,831.22 |
| | | **24,122** | | **$5,555,067.66** |
| | | | | |
| **HUNT** | 1/3/2011 | 4,000 | $178.67 | $714,680.00 |
| | 2/1/2011 | 4,000 | $214.84 | $859,360.00 |
| | 3/1/2011 | 5,000 | $206.22 | $1,031,100.00 |
| | 4/1/2011 | 5,000 | $241.00 | $1,205,000.00 |
| | 5/2/2011 | 5,000 | $238.22 | $1,191,100.00 |
| | 6/1/2011 | 5,000 | $269.23 | $1,346,150.00 |
| | 7/1/2011 | 3,000 | $262.06 | $786,180.00 |
| | 8/1/2011 | 3,000 | $268.52 | $805,560.00 |
| | 9/1/2011 | 1,589 | $234.53 | $372,668.17 |
| | | **35,589** | | **$8,311,798.17** |
| | | | | |
| **HYMAN** | 5/24/2011 | 4,760 | $250.00 | $1,190,000.00 |
| | 6/3/2011 | 4,760 | $275.00 | $1,309,000.00 |
| | | **9,520** | | **$2,499,000.00** |
| | | | | |
| **KILGORE** | 5/2/2011 | 29,011 | $238.22 | $6,911,000.42 |
| | 7/25/2011 | 566 | $280.57 | $158,802.62 |
| | | **29,577** | | **$7,069,803.04** |
| | | | | |
| **MCCORD** | 5/24/2011 | 1,436 | $250.00 | $359,000.00 |
| | 7/11/2011 | 1,504 | $300.00 | $451,200.00 |
| | | **2,940** | | **$810,200.00** |
| | | | | |
| **SARANDOS** | 4/27/2011 | 17,950 | $228.67 | $4,104,626.50 |
| | 8/8/2011 | 5,439 | $229.95 | $1,250,698.05 |
| | 8/8/2011 | 1,971 | $230.00 | $453,330.00 |
| | | **25,360** | | **$5,808,654.55** |
| | | | | |
| **WELLS** | 5/2/2011 | 3,264 | $238.22 | $777,550.08 |
| | 5/24/2011 | 1,646 | $249.99 | $411,483.54 |
| | 7/5/2011 | 1,286 | $279.99 | $360,067.14 |
| | | **6,196** | | **$1,549,100.76** |
| | | | | |
| **TOTAL** | | **385,661** | | **$89,552,794.59** |

- 23 -

## DEFENDANTS ISSUE IMPROPER STATEMENTS
## REGARDING NETFLIX'S ABILITY TO ACQUIRE CONTENT

75.    On January 26, 2011, Netflix issued a letter to shareholders announcing its fourth quarter and year-end financial results for the period ended December 31, 2010. The Company reported net income of $47 million, or $0.87 diluted earnings per share ("EPS") for the fourth quarter of 2010. The Company reported 20 million subscribers and net subscriber additions of 3.08 million for its fourth quarter 2010, and a growth of 7.7 million net subscriber additions for 2010, up from its forecast at the start of 2010 of net additions of 3.6 million. Regarding the Company's business outlook, the letter stated in part:

**Business Outlook**

Going forward we are providing more detail in our guidance for the current quarter by breaking out domestic versus international and by providing operating income guidance. Our business is so dynamic that we will be doing less calendar year guidance than in the past.

Our domestic guidance for Q1 2011 is:

- Subscribers between 21.9 million and 22.8 million

- Revenue between $684 million and $704 million

- Operating Income between $98 million and $116 million

* * *

Our global guidance for Q1 2011 is:

- Net Income between $49 million and $62 million

- EPS between $0.90 and $1.13

For the year 2011:

- We expect to operate domestically at approximately a 14% operating margin

- We expect domestic subscriber net additions to continue to grow in 2011

- We expect our Canadian operations to have a positive operating margin in Q3

- 24 -

1

2

- We expect to have approximately $50 million in operating losses in international in 2H of 2011 as we expand beyond Canada

3

76. The letter also stated in part:

4

In November last year we introduced our $7.99 per month pure streaming plan, and we increased the prices on our combination plans, which include streaming and unlimited DVD rentals. As you can see from our strong Q1 subscriber guidance, our pure streaming plan has a great deal of consumer appeal. More than one third of new subscribers are signing up for the pure streaming plan, and we expect that percentage to grow over time. The balance of new subscribers primarily takes our $9.99 1-DVD combination plan. Very few of our existing subscribers are downgrading to the pure streaming plan.

5

6

7

8

9

10

Our three virtuous cycles of subscriber growth are:

11

12

1. More subscribers means more money to license content with, *which drives more subscriber growth*

13

14

2. More subscribers means more word-of-mouth from subscribers to those who are not yet subscribers, *which drives more subscriber growth*

15

16

3. More subscribers means we can increase R&D spend to improve our user experience, *which drives more subscriber growth*

17

\* \* \*

18

**Streaming Content**

19

20

We continue to expand our selection of movies and TV shows available to watch instantly. Our Epix deal just completed its first full quarter of current studio releases and great catalog movies. We also closed an expansive new deal with ABC/Disney that includes all previous seasons of "Lost," "Desperate Housewives," and "Brothers and Sisters" from ABC and "Phineas and Ferb," "Good Luck Charlie" and a host of other popular shows and original movies from the Disney Channel.

21

22

23

24

Our unique direct deals with independent producers and distributors have made it possible for us to bring all five of the just-announced 2011 Academy Awards-nominated Best Documentary Feature films to our growing streaming library. Two of those films – "Exit Through the Gift Shop" and "Restrepo"– are available to stream now. "Waste Land" is coming on March 29 and "Gasland" and "Inside Job" will be coming soon through existing deals.

25

26

27

28

- 25 -

Our interest in television shows is high. Our primary strategy is to offer complete previous seasons of shows rather than offering those shows the day of, or a few days after, broadcast, during the critical ratings and revenue window. This is in the best interest of content owners and is consistent with our desire to offer a very low-cost service for consumers. As with theatrical ticket sales, VOD and the 28-day DVD sale window, this allows studios to capture the market for those most interested in seeing content right away. You will occasionally see us offering shows day after broadcast, as we do with "Saturday Night Live," or 15 days after broadcast, as we do with Disney Channel programs, but it doesn't represent a change in our overall TV strategy.

\* \* \*

### Operating Margins

Managing to a target operating margin has proven to be effective for us, and we plan to continue to do so. For the next few quarters we will target a domestic operating margin of about 14%, which we believe is a good balance of growth and earnings. The variable costs of DVD shipments, and the seasonal nature of big DVD releases, contributed to material expense seasonality in the past. While this remains true of DVD, this expense seasonality will smooth out as streaming becomes the majority of our content expense. Seasonality of subscriber growth will remain, but the domestic margin structure going forward should be less seasonal than in the past. Occasionally, we will have the opportunity to close a big streaming content deal, and our margins will dip temporarily, *but most of the streaming deals are less lumpy, and we will be able to manage close to the domestic 14% target.*

77.     After releasing its 2010 fourth quarter and year-end financial results on January 25, 2011, Netflix hosted a conference call with analysts, investors, and media representatives, during which defendant Hastings represented the following:

[ANALYST:] Do you believe it will get harder to acquire incremental films and TV shows from major Hollywood studios?  And, where are you in quantity today and where would you hope to be in a few years?

[HASTINGS:]Doug, no it's not gotten harder, it's gotten easier as we pay more.  Three, four years ago, when we couldn't pay much, it was very hard, and, now because we've got significant dollars to spend, we've got people coming to us and that makes perfect sense.  So, while we're feeling great about both our ability to make content owners a lot of money and to get deals done and continue to fill out and improve our selection.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

78.     On February 18, 2011, Netflix filed its Form 10-K with the U.S. Securities and Exchange Commission ("SEC") for the year ended December 31, 2010, in which it discussed the impact of possible changes with content distributors. The Form 10-K contained improper statements by defendants Hastings, Wells, Barton, Haley, Hoag, Mather, Giancarlo, and Battle. The Form 10-K assured investors about Netflix's margins:

> *We believe that the streaming content we make available to our subscribers is sufficiently diversified, such that we will not be forced to pay licensing fees for content in excess of our desired operational margins.* We believe that any failure to secure content will manifest in lower subscriber acquisition and retention and not in materially reduced margins. Nonetheless, given the multiple-year duration and largely fixed nature of content licenses, if we do not experience subscriber acquisition and retention as forecasted, our margins may be impacted by these fixed content licensing costs. During the course of our license relationship, various contract administration issues can arise. To the extent that we are unable to resolve any of these issues in an amicable manner, our relationship with the studios and other content distributors or our access to content may be adversely impacted.

79.     This statement was improper because it concealed the significant price increases then being demanded from Netflix by content providers.

80.     On April 25, 2011, Netflix issued a letter to shareholders announcing its first quarter 2011 financial results. The Company reported net income of $60 million, or $1.11 diluted EPS, and revenue of $718 million for the quarter ended March 31, 2011. The Company further reported strong quarterly growth in subscribers of 23.6 million globally. Additionally, Netflix provided its outlook for the second quarter of 2011, stating in part:

**Business Outlook**

|  | Guidance |
|---|---|
| **Domestic Q2 2011**: | |
| Subscribers | 24.0m to 24.8m |
| Revenue | $762m to $778m |
| Operating Income | $100m to $116m |
| | |
| **International Q2 2011:** | |
| Subscribers | 900k to 1,050k |
| Revenue | $16m to $20m |
| Operating Loss | -$14m to -$10m |

Global Q2 2011:

| | |
|---|---|
| Net Income | $50m to $62m |
| EPS | $0.93 to $1.15 |

81.     The letter also stated in part:

**Domestic Streaming Content**

In Q1, we completed several important streaming content deals, bringing in additional first-time partners, extending and expanding relationships with other providers and pioneering some new approaches we believe will help Netflix continue to differentiate itself. The result is that Netflix subscribers can instantly enjoy a wider and better selection of TV shows and movies than ever before.

*   *.   *

As streaming grows, TV shows and feature films are being enjoyed in nearly equivalent volume by our subscribers and our content acquisition team is focusing their attention accordingly. We've recently added lots of new TV episodes, and the profile and completeness of the shows continues to improve. As for movies, we've recently added a large number of core catalog titles from Paramount that are exclusive to Netflix against broadcast, cable and other over-the-top services and titles from Lionsgate and MGM that are exclusive against other over-the-top services.

While the size of these deals and their impact on our P&L is often speculated about in the press, spending typically takes place over multiple years and the amortized cost of these deals is taken into consideration in our 14% target operating margin model.

82.     After releasing its first quarter 2011 financial results on April 25, 2011, Netflix hosted a conference call with analysts, investors, and media representatives. In response to a question about content spending, defendant Hastings stated "[w]e'll run the US around 14% operating margin and spend on content in accordance with that."

83.     On June 1, 2011, defendant Wells spoke at the Bank of America Merrill Lynch Technology Conference. In response to an analyst question about content spending, Wells stated in part:

[ANALYST:] With these seemingly large numbers, how are you able to manage your financial goals when you're adding, and manage to a long-term operating margin even as you add so much new spend in a new area that really, until January, you didn't have a direct product for?

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

[WELLS:]   *Well, I'd say that the discipline that we're holding to for this year is to hold to a 14 – around a 14% domestic operating margin target.* And the numbers that you see in the press, some accurate, some not, are indicative of the total value of a deal.  So if it's a three-year deal or a five-year deal, it's going to be the total value of that deal.  It isn't the P&L expense that we would see in any given year or quarter, and so it's going to be a fraction of that.  And so to the extent that we're holding to a content budget, the deals that we're making, *I can assure you, are still well within the expectations of our operating margin targets.*

84.    On July 12, 2011, Netflix announced it had raised prices by 60% for U.S. subscribers who want both services, citing the costs to acquire and deliver films and television shows.  Netflix stated:

Given the long life we think DVDs by mail will have, treating DVDs as a $2 add-on to our unlimited streaming plan neither makes great financial sense nor satisfies people who just want DVDs.

85.    On July 13, 2011, Netflix announced it had signed a multi-year agreement renewing and expanding its rights to movies and television shows from NBCUniversal.

86.    Despite the severely negative reaction of customers to the price increase, the stock market reacted favorably to these two announcements.  On July 25, 2011, Netflix issued a letter to shareholders announcing its second quarter 2011 financial results.  The Company reported net income of $68 million, or $1.26 diluted EPS, and revenue of $789 million for the second quarter ended June 30, 2011.  The Company further reported over 25 million global subscribers for the second quarter.  The letter further stated in part:

In Q3 we will see only the negative impact of the pricing change, given that the announcement was early in the quarter and that the increases won't take effect until late in the quarter (September 15th on average). We expect domestic net additions in Q3 to be lower than the previous year Q3, and because of the timing of the price change, revenues will only grow slightly on a sequential basis.

In Q4, we expect domestic net additions to return to a pattern of year-over-year growth while revenue will reflect a full quarter's impact of the pricing changes, which could result in Q4 being our first billion dollar global revenue quarter, driven by strong U.S. performance.

While we expect our revenue to increase in Q4 from this pricing change, we are still targeting a 14% domestic operating margin because we will continue to increase our spending on streaming content, ensuring the service remains by far the best value out there when it comes to enjoying instant, on-demand movies and TV shows.

87.     After releasing its second quarter 2011 financial results on July 25, 2011, Netflix hosted a conference call with analysts, investors, and media representatives.  In discussing the pricing changes, defendants stated:

[HASTINGS:] Like any customer-driven organization, we feel bad about having customers upset with us, but we feel great about the amazing new content we're going to be able to license in the fourth quarter and next year, which will further propel our growth and our subscriber satisfaction. . . . And it's going to allow us to have just fantastic streaming content going forward.

*   *   *

[ANALYST:] Given your relatively modest cash position, relative to the size of checks you're writing for content, and the success you're having with that content investment, what is the rationale of buying back stock?  Given the multiple you get for subs, wouldn't you generate more value by investing in adding subs versus buybacks?

*   *   *

[WELLS:]     So we have three legs, basically, of investment.  One is our streaming content investment.  One is our marketing.  And one is our earnings target, basically putting money towards – back to investors.  And setting that 14% operating margin – domestic operating margin target allows us to set basically a content spend and a marketing spend.  And so how we thank about cash relative to the buyback is independent of how much we spend on marketing.  And I'd say how we approach the buyback is what could we do with that cash as an alternative use?  Should we hold it as an insurance policy, or should we return it to shareholders and a buyback is the most efficient way to do that.

### THE TRUTH BEGINS TO EMERGE

88.     On September 1, 2011, following the market close, Starz announced it was pulling its content from Netflix as a result of failed negotiations. Starz provided Netflix with some of Netflix's most valuable and viewed content.

- 30 -

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

89.     On September 15, 2011, Netflix issued a press release announcing an update to its third quarter 2011 guidance. Netflix lowered its third quarter 2011 domestic subscriber estimates, expecting to end the third quarter with 21.8 million domestic streaming subscribers and 14.2 million U.S. DVD subscribers, down from its prior forecast of 22 million and 15 million, respectively. More significantly, *Netflix lost a million subscribers almost immediately upon its price increases becoming effective.*

90.     On this news, Netflix's stock collapsed $39.46 per share to close at $169.25 per share on September 15, 2011, a one-day stock market capitalization decline of 19% and more than $2 billion.

91.     Netflix's stock market capitalization dropped even further when the Company announced on September 19, 2011, that it would be raising prices and charging separately for its streaming video and DVD services. The streaming service would retain the Netflix name, while the DVD service would be renamed Qwikster. In less than a month, the Company's market capitalization declined $6.8 billion, a nearly 44% decline.

92.     On October 24, 2011, Netflix issued its third quarter 2011 shareholder letter in which it *reported a net loss of 810,000 U.S. subscribers, translating into a cumulative loss of 5.5 million subscribers.* The subsequently filed Form 10-Q revealed that Netflix's obligations for content over the coming years had skyrocketed to $3.5 billion, with $2.8 billion due within three years.

## REASONS THE STATEMENTS WERE IMPROPER

93.     The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)     Netflix had short-term contracts with content providers and defendants were aware that the Company faced a Hobbesian choice to renegotiate the contracts in 2011 at much higher rates or not renew them at all;

- 31 -
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1              (b)      Content providers were already demanding much higher license fees, which

2      would dramatically alter Netflix's business;

3              (c)      Defendants recognized that Netflix's pricing would have to dramatically

4      increase to maintain profit margins given the streaming content costs they knew the Company would

5      soon be incurring; and

6              (d)      Netflix was not on track to achieve the earnings forecasts made by and for the

7

8      Company for 2011.

9                                    **DAMAGES TO NETFLIX**

10         94.      As a result of the Individual Defendants' improprieties, Netflix disseminated

11     improper, public statements concerning its ability to maintain its margins and content providers

12     contracts.   These improper statements have devastated Netflix's credibility as reflected by the

13     Company's almost $9 billion, or 57%, market capitalization loss.

14

15         95.      The Company has admittedly been damaged.   The Company disclosed in its 2011

16     Form 10-K filed on February 10, 2012, that the change in its pricing structure is set to continue to

17     damage the Company's once valuable reputation.   The Form 10-K contains the following new risk

18     factor that had not appeared in its SEC filings before.   The Form 10-K stated:

19           **If we are unable to continue to recover from the negative consumer
             reaction to our price change and other announcements made during the**
20           **third quarter of 2011, our business will be adversely affected.**

21           In the third quarter of 2011, we made a series of announcements regarding
             our business, including the separation of our unlimited DVD-by-mail and
22           unlimited streaming plans with a corresponding price change for some of our
             customers, the rebranding of our DVD-by-mail service, and the subsequent
23           retraction of our plans to rebrand our DVD-by-mail service. Consumers
             reacted negatively to these announcements, adversely impacting our brand
24           and resulting in higher than expected customer cancellations. These adverse
25           effects, coupled with the increasingly long-term and fixed-cost nature of our
             content acquisition licenses, will likely continue to have an adverse impact on
26           our results of operations. While we have seen a return to growth in our core
27           domestic streaming segment, *we believe the process of repairing our brand
             will take time. If we are unable to continue to repair the damage to our*
28

                                          - 32 -
                        VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

*brand, our results of operations, including cash flow, will be adversely affected.*

96. Further, as a direct and proximate result of the Individual Defendants' actions, Netflix has expended, and will continue to expend, significant sums of money. Such expenditures include, but are not limited to:

(a) costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b) costs incurred in the repurchases due to the Company overpaying for its own shares; and

(c) costs incurred from compensation and benefits paid to the defendants who have breached their duties to Netflix.

97. Moreover, these actions have irreparably damaged Netflix's corporate image and goodwill. For at least the foreseeable future, Netflix will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Netflix's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

98. Plaintiff brings this action derivatively in the right and for the benefit of Netflix to redress injuries suffered, and to be suffered, by Netflix as a direct result of breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants. Netflix is named as a nominal defendant solely in a derivative capacity. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99. Plaintiff will adequately and fairly represent the interests of Netflix in enforcing and prosecuting its rights.

100.    Plaintiff was a shareholder of Netflix at the time of the wrongdoing complained of, has continuously been a shareholder since that time, and is a current Netflix shareholder.

101.    The current Board of Netflix consists of the following eight individuals: defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton, Battle, and Mather. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

(a)    The Director Defendants challenged misconduct at the heart of this case constitutes a breach of the fiduciary duty of loyalty. As the ultimate decision-making body of the Company, the Board affirmatively adopted, implemented, and condoned a business strategy based on deliberate and widespread improper activities that benefited themselves and wasted the Company's assets on improper stock repurchases. Causing the Company to engage in the improper tactics is not a protected business decision and such conduct can in no way be considered a valid exercise of business judgment. Accordingly, demand on the Board is excused.

(b)    On June 11, 2010, defendants Haley, Barton, Giancarlo, Battle, Hastings, and Hoag, as members of the Netflix Board, authorized the repurchase of $300 million of the Company's stock. These defendants, along with defendant Mather, who was later appointed to the Board, allowed Netflix to repurchase a total of over $209.3 million of its own stock under that repurchase program. The repurchases of the Company's stock were at artificially inflated prices as a result of the improper public statements, press releases, and filings with the SEC that misrepresented the Company's business prospects. Each of these defendants knew or were reckless in not knowing that the information the Company was disclosing was improper when made, and that the Company's stock was artificially inflated. Nonetheless, defendants Haley, Barton, Giancarlo, Battle, Hastings, Hoag, and Mather continued to direct the Company to repurchase the shares. These decisions were not the product of valid business judgment. As such, demand is futile as to defendants Haley, Barton, Giancarlo, Battle, Hastings, Hoag, and Mather.

- 34 -

(c)      As a result of the actions complained of herein, defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton, and Battle each received a financial benefit in that each and all of them were able to redeem stock options at a much greater profit than they would have but for the stock repurchase program they directed Netflix to undertake.  Moreover, by colluding with each other and the other Individual Defendants, each of defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton and Battle has demonstrated that they are unable and unwilling to act independently of the other Individual Defendants.   Consequently, each of defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton and Battle is incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action;

(d)      Defendants Haley, Battle, and Hoag are also incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action given that they serve on the Board's Compensation Committee with each other, and all profited from the alleged wrongdoing;

(e)      Defendants Haley, Giancarlo, and Mather are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action given that they serve on the Board's Audit Committee together, and also both benefited from the alleged wrongdoing;

(f)      At times relevant hereto, defendants Giancarlo, Haley, and Mather were members of the Audit Committee of the Board. As members of the Audit Committee defendants Giancarlo, Haley, and Mather were charged with assisting the Board in fulfilling its oversight responsibility, monitoring financial risk exposure, and monitoring corporate compliance efforts. Defendants Giancarlo, Haley, and Mather utterly and consciously disregarded these duties with respect to the Company's stock repurchase program. The Audit Committee and its members, among other things, failed to ensure that the Company was protecting its own assets and put the financial concerns of themselves and their colleagues above those of the Company.  Accordingly, defendants

- 35 -

1  Giancarlo, Haley, and Mather, each as members of the Audit Committee, face a substantial

2  likelihood of liability for the claims asserted in this action;

3          (g)     Defendants Hoag and Barton are also connected to each other, although

4  Netflix does not seem interested in publicizing the fact, and are incapable of independently and

5  disinterestedly considering a demand to commence and vigorously prosecute this action. Defendant

6  Barton is a co-founder of Zillow, Inc. ("Zillow"), where he is now Executive Chairman of the Board.

7  While not contained in defendant Hoag's Netflix bio, defendant Hoag is also on the Zillow Board;

8

9          (h)     In addition, defendant Battle is incapable of independently and disinterestedly

10  considering a demand to commence and vigorously prosecute this action given that he and defendant

11  Kilgore both serve on the Board of Linkedin Corp.  Once again, their bios on the Netflix website

12  omit this connection;

13

14          (i)     Furthermore, defendant Hoag is a founding General Partner at Technology

15  Crossover Ventures, a private equity and venture capital firm.  He has been involved in a large

16  number of technology investments including Actuate Software, Ariba Technologies, Altiris,

17  BlueCoat Systems, ClNet, CompUSA, Encompass, EXE Technologies, Expedia, Fandango,

18  Facebook, Groupon, Intuit, Macromedia, Netflix, NETCOM, ONYX Software, PictureTel, Pure

19  Software, RealNetworks, SpringStreet, Sybase, TechTarget, Vacationspot.com, Viant, and Zillow

20  among others. Pure Software was a company founded by defendant Hastings in 1991. In 1996, Pure

21  Software merged with Atria to form Pure Atria Corporation, which was acquired by Rational

22  Software in 1997 and provided Hastings with the capital he needed to start Netflix. According to the

23  Technology Crossover Ventures website, the company is currently funding Netflix and Zillow.

24  Consequently, defendant Hoag is incapable of independently and disinterestedly considering a

25  demand to commence and vigorously prosecute this action, a point driven home by his 2001

26  statement regarding Technology Crossover Ventures' investment in Netflix, "[it] was a bet on

27  Reed.";

28

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1          (j)     Defendant Haley is a co-founder of Redpoint Ventures ("Redpoint"), a venture

2 capital firm, and has been a Managing Director of the firm since October 1999. According to

3 Redpoint's website, Redpoint typically invests $1 million to $10 million in early stage companies

4 ranging from concepts to companies with products already in market. Redpoint's early-stage

5 investments include defendant Hastings' initial startup, Pure Software, and Netflix. Redpoint also

6

7 invested in Ask.com f/k/a Ask Jeeves, of which defendant Battle was previously Executive

8 Chairman of the Board. Defendant Battle was also CEO of Ask Jeeves from 2000 to 2003.

9 Consequently, defendant Haley is incapable of independently and disinterestedly considering a

10 demand to commence and vigorously prosecute this action;

11          (k)     Additionally, defendant Barton is a Venture Partner with Benchmark Capital

12 ("Benchmark"). Benchmark is a venture capital firm also responsible for the early stage funding.

13 According to the Benchmark website, Benchmark has financially backed Open Table, Inc., whose

14 Board defendant Battle currently sits on, and Shopping.com, Inc., whose Board defendant Mather sat

15 on until it was acquired by eBay Inc. in 2005. Benchmark was also a major investor in Webvan.com

16

17 ("Webvan"), the former employer of defendant Hyman. Defendant Hyman also held the position of

18 general counsel at Webvan. Finally, defendant Hastings and Benchmark General Partner, Bill

19 Gurley, are both listed as "Partners" in Rocketship Education, a national network to eliminate the

20 achievement gap in education in high poverty neighborhoods. Consequently, defendant Barton is

21 incapable of independently and disinterestedly considering a demand to commence and vigorously

22

23 prosecute this action against the Individual Defendants;

24          (l)     At all times relevant hereto, Netflix's Code, which applies to Netflix's officers

25 and directors, stated that:

26        Netflix Parties are expected to act and perform their duties ethically and honestly and

27        with the utmost integrity. Honest conduct is considered to be conduct that is free
            from fraud or deception. Ethical conduct is considered to be conduct conforming to

28        accepted professional standards of conduct. Ethical conduct includes the ethical
            handling of actual or apparent conflicts of interest between personal and professional

relationships.... A conflict of interest exists where the interests or benefits of one person or entity conflict or appear to conflict with the interests or benefits of the Company.

      (m)    The Individual Defendants, including defendants Hastings, Kilgore, Barton, Battle, Giancarlo, Haley, Hoag, and Mather violated the Code by knowingly wasting the Company's assets, while at the same time reaping financial benefits, by repurchasing Netflix stock at inflated prices. The failure of the Director Defendants to adhere to the Code lead directly to the waste of corporate assets suffered by Netflix. Consequently, each of the Director Defendants faces a substantial likelihood of liability for the claims asserted in this action;

      (n)    Defendant Hastings could not possibly be independent given his positions with the Company. Defendant Hastings is the Company's CEO and President. Defendant Hastings derives the majority of his income from his positions with Netflix, and equally important, a majority of defendant Hastings' income comes in the form of stock options and he directly benefitted from the inflated Netflix stock prices achieved by the Company's stock repurchases;

      (o)    Defendant Hastings could also not possibly be independent given his longstanding relationships with defendants Hunt and McCord. As noted in an article run by CNN Money, "when he was 30, Hastings started a company called Pure Software. Neil Hunt was there in the early days of Pure, as was Patty McCord, who now heads human resources at Netflix";

      (p)    Defendant Kilgore cannot be independent given her extensive direct involvement in selling the improperly granted stock options, as she is both directly interested in the challenged transactions and faces a substantial risk of liability as a result of her engagement in the challenged transactions. Moreover, Kilgore served as the Company's Chief Marketing Officer from March 2000 to January 21, 2012. During her tenure she served alongside defendants Hastings, Wells, Hunt, Hyman, and McCord. She also serves on the Linkedin Corporation Board with defendant Battle; and

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(q)     Finally, defendants Hastings, Barton, Battle, and Kilgore all attended Stanford University and have long standing personal relationships and are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action.

102.     Moreover, the acts complained of constitute violations of the fiduciary duties owed by Netflix's officers and directors and these acts are incapable of ratification.

103.     Each of the Director Defendants authorized and/or permitted the improper statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various of the improper statements and are principal beneficiaries of the wrongdoing alleged herein and thus, could not fairly and fully prosecute such a suit even if such suit was instituted by them.

104.     Netflix has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Individual Defendants and current Board have not filed any lawsuits against themselves or others who were responsible for that wrongful conduct to attempt to recover for Netflix any part of the damages Netflix suffered and will suffer thereby.

105.     If Netflix's current and past officers and directors are protected against personal liability for their acts of mismanagement and breach of fiduciary duty alleged in this Complaint by directors' and officers' liability insurance, they caused the Company to purchase that insurance for their protection with corporate funds, i.e., monies belonging to the stockholders of Netflix. However, the directors' and officers' liability insurance policies covering the defendants in this case contain provisions that eliminate coverage for any action brought directly by Netflix against these defendants, known as the "insured versus insured exclusion." As a result, if these directors were to cause Netflix to sue themselves or certain of the officers of Netflix, there would be no directors' and officers' insurance protection and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  If there is no

- 39 -

1    directors' and officers' liability insurance, then the current directors will not cause Netflix to sue the

2    defendants named herein, since they will face a large uninsured liability and lose the ability to

3    recover for the Company from the insurance.

4         106.    Moreover, despite the Individual Defendants having knowledge of the claims and

5    causes of action raised by plaintiff, the current Board has failed and refused to seek to recover for

6    Netflix for any of the wrongdoing alleged by plaintiff herein.

7

8         107.    Plaintiff has not made any demand on the other shareholders of Netflix to institute

9    this action since such demand would be a futile and useless act for at least the following reasons:

10            (a)    Netflix is a publicly held company with over 55.4 million shares outstanding

11   and thousands of shareholders;

12            (b)    making demand on such a number of shareholders would be impossible for

13   plaintiff who has no way of finding out the names, addresses, or phone numbers of shareholders; and

14

15            (c)    making demand on all shareholders would force plaintiff to incur excessive

16   expenses, assuming all shareholders could be individually identified.

17                              **COUNT I**

18            **Against the Individual Defendants for Breach of Fiduciary Duty**

19        108.    Plaintiff incorporates by reference and realleges each and every allegation contained

20   above, as though fully set forth herein.

21        109.    The Individual Defendants owed and owe Netflix fiduciary obligations. By reason of

22   their fiduciary relationships, the Individual Defendants owed and owe Netflix the highest obligation

23   of good faith, fair dealing, loyalty, and due care.

24

25        110.    The Individual Defendants and each of them, violated and breached their fiduciary

26   duties of candor, good faith, and loyalty. More specifically, the Individual Defendants violated their

27   duty of good faith by making improper statements and/or consciously failing to prevent the

28   Company from engaging in the unlawful acts complained of herein.

111.    Defendants Hastings and Wells either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.  Defendants Hastings and Wells either knew, were reckless, or were grossly negligent in not knowing the Company's content licensing fees would become so expensive that the Company could not maintain its margins as they represented.  Accordingly, Hastings and Wells breached their duty of care and loyalty to the Company.

112.    Director Defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton, Battle, and Mather, as directors of the Company, owed Netflix the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the improper activity concerning the Company's content fee licenses.  Moreover, these defendants made improper statements to the public. Defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton, Battle, and Mather knew or were reckless in not knowing that the Company's content licensing fees would become so expensive that the Company could not maintain its margins as they represented.  Accordingly, defendants Hastings, Kilgore, Giancarlo, Hoag, Haley, Barton, Battle, and Mather breached their duty of loyalty to the Company.

113.    Defendants Hastings, Giancarlo, Hoag, Haley, Barton, Battle, and Mather violated and breached their fiduciary duties of loyalty, reasonable inquiry, oversight, good faith, and supervision by knowingly or recklessly authorizing and failing to halt the repurchase of shares while Netflix's share price was artificially inflated as a result of the improper statements regarding the Company's business prospects, content license fees, and profit margins.  While Netflix stock was artificially inflated, Netflix repurchased 899,847 shares of its own stock, for a total cost of $209,380,359.

114.    The Audit Committee Defendants Giancarlo, Haley, and Mather, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained

improper statements and omissions.  The Audit Committee Defendants completely and utterly failed in their duty of oversight, and defendants Giancarlo, Haley, and Mather failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

115.    Defendants Hastings, Hunt, Sarandos, Hyman, Wells, McCord, Kilgore, Giancarlo, Hoag, Haley, Barton, and Battle breached their duty of loyalty by selling Netflix stock on the basis of the knowledge of the improper information described above before that information was revealed to the Company's shareholders.  The information described above was proprietary, non-public information concerning the Company's future business prospects.  It was a proprietary asset belonging to the Company, which defendants Hastings, Hunt, Sarandos, Hyman, Wells, McCord, Kilgore, Giancarlo, Hoag, Haley, Barton, and Battle used for their own benefit when they sold Netflix common stock.

116.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Netflix has sustained significant damages, as alleged herein.  As a result of the misconduct alleged herein, these defendants are liable to the Company.

117.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

### COUNT II

### Against the Individual Defendants for Waste of Corporate Assets

118.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

119.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by: (i) directing Netflix to repurchase almost $300 million of its own stock at artificially inflated prices; (ii) by paying bonuses to certain of its executive officers; and (iii) incurring potentially hundreds of millions of dollars of legal liability and/or legal costs to defend defendants' unlawful actions.

120.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

121.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

122.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

123.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Netflix. The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Netflix.

124.    Defendants Hastings, Hunt, Sarandos, Hyman, Wells, McCord, Kilgore, Giancarlo, Hoag, Haley, Barton, and Battle sold Netflix stock while in possession of material, adverse non-public information that artificially inflated the price of Netflix stock.  As a result, defendants Hastings, Hunt, Sarandos, Hyman, Wells, McCord, Kilgore, Giancarlo, Hoag, Haley, Barton, and Battle profited from their misconduct and were unjustly enriched through their exploitation of material and adverse inside information.

125.    Plaintiff, as a shareholder and representative of Netflix, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

126.    Plaintiff, on behalf of Netflix, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Netflix, demands judgment as follows:

- 43 -

A.      Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Netflix to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Netflix and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote of the following Corporate Governance Policies:

1.      a provision to control insider selling;

2.      a proposal to create a Board committee that reviews whether the Company should authorize a share repurchase and determine the amount of repurchases on a quarterly basis;

3.      a proposal to make sure significant business changes consider the long-term impact on customer retention;

4.      a proposal to strengthen the Company's controls over financial reporting;

5.      a proposal to strengthen Netflix's oversight of its disclosure procedures;

6.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board; and

7.      a provision to permit the shareholders of Netflix to nominate at least three candidates for election to the Board;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Netflix has an effective remedy;

1    D.    Awarding to Netflix restitution from defendants, and each of them, and ordering

2 disgorgement of all profits, benefits, and other compensation obtained by the defendants, including

3 all ill-gotten gains from insider selling by defendants;

4    E.    Awarding to plaintiff the costs and disbursements of the action, including reasonable

5

6 attorneys' fees, accountants' and experts' fees, costs, and expenses; and

7

8    F.    Granting such other and further relief as the Court deems just and proper.

9 **JURY DEMAND**

10 Plaintiff demands a trial by jury.

11 DATED: February 24, 2012

ROBBINS UMEDA LLP
BRIAN J. ROBBINS
KEVIN A. SEELY
JAY N. RAZZOUK

BRIAN J. ROBBINS

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile (619) 525-3991

GOLDFARB LLP
HAMILTON LINDLEY
2501 N. Harwood Street, Suite 1801
Dallas, TX 75201
Telephone: (214) 583-2257
Facsimile: (214) 583-2234
hlindley@goldfarbllp.com

Attorneys for Plaintiff

698927

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

<u>VERIFICATION</u>

I, Antonios Soulis, hereby declare as follows:

I am the plaintiff in the within entitled action.  I have read the Verified Shareholder Derivative Complaint for Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:

Dated:02/20/2012

_____
ANTONIOS SOULIS